IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHARLES R. HOPPLE,

          Petitioner,

    vs.

JILL BROWN, Warden,

          Respondent.

)
)
)
)
)
)
)
)
)
)

No C 04-2825 JSW (PR)

ORDER DENYING PETITION
FOR A WRIT OF HABEAS
CORPUS

## INTRODUCTION

    Charles R. Hopple, a prisoner of the State of California currently incarcerated at San Quintin State Prison, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Per order filed on April 14, 2005, this Court ordered Respondent to show cause as to three claims raised in the petition.  Respondent filed an answer on May 25, 2005.  This order denies the petition for writ of habeas corpus on the merits.

## PROCEDURAL BACKGROUND

    The parties agree on the following procedural history: on December 2, 2002, a jury in the Superior Court of the State of California in and for the County of Santa Clara found Petitioner guilty of first degree burglary and first degree robbery, with enhancements for personal use of a deadly weapon and taking property worth more than $50,000.  On February 21, 2003, Petitioner was sentenced to a term of eight years in state prison.

Petitioner appealed to the California Court of Appeal, Sixth District, which affirmed the conviction in an unpublished, reasoned opinion filed on March 12, 2004. On June 14, 2004, the Supreme Court of California denied a petition for review. On July 13, 2004, Petitioner filed the instant petition, which this Court found presented both exhausted and unexhausted claims. This Court ordered Petitioner to notify the Court how he wished to proceed on his mixed petition and Petitioner notified this Court he wished to dismiss his unexhausted claim and proceed in this Court on the three claims in the petition that were properly exhausted in state courts.

## STATEMENT OF THE FACTS

The facts of the case are summarized from the California Court of Appeal opinion as follows:

### I. Prosecution Case

### A. Relationship Between Defendant and Victim

Defendant met Jasper in 1991 or 1992 when defendant was a customer of Jasper's business and the two became good friends. Defendant worked for Jasper in the mid-1990's. After four or six months, Jasper let defendant go because defendant was having difficulty working with Jasper's son. Jasper felt bad about letting defendant go. Consequently, he helped defendant out when defendant got into financial trouble.

Defendant called Jasper by telephone in mid-April or early May of 2002. The following Saturday, defendant showed up at Jasper's home and visited with him for about an hour and a half. According to Jasper, Defendant was very tan and in the best physical shape he had ever seen him. Defendant had a very distinctive odor about him, which Jasper guessed was a combination of tanning oils and cigarettes.

Jasper has congestive lung pulmonary disease and is on oxygen 24 hours a day. During their visit, defendant asked Jasper to show him how his oxygen system worked.

Three days after he visited Jasper, defendant called Jasper and told him he was in financial trouble and had filed for bankruptcy. Defendant asked Jasper to help him pay off the lease on his car, a 1999 Infiniti I30. Jasper did not give defendant the money.

### B. Home Invasion Robbery

In the early morning hours of Sunday, May 26, 2002, Jasper was home alone in bed. Jasper awoke and saw a man coming toward him dressed all in black, with a black stocking mask, black cap, black gloves, and a dark camouflage-patterned coat. The intruder punched Jasper in the face more than four or five times. Jasper fought back. During the struggle, Jasper recognized his assailant's scent as the same odor he had smelled when defendant visited him a few weeks before. During the struggle, Jasper's oxygen machine fell off. After Jasper told his assailant that he would die if the oxygen were not turned up, the intruder ran downstairs, turned up the oxygen and returned.

Jasper, who kept large amounts of cash at home, pulled a bag containing $ 68,000 out of a drawer in his bathroom and gave it to defendant. Jasper also gave defendant $9,700 in cash that was on a table in his bedroom. Defendant told Jasper to wait, went downstairs, and left. A minute or two later, Jasper called the police. The total amount stolen was $77,700.

### C. Interview of Defendant

Four police officers went to defendant's home around 4:25 a.m., approximately one hour after Jasper reported the robbery. Defendant was wide-awake and appeared as if he had just bathed. His hair was freshly combed. Officer Bell described the defendant as "very nervous" after the officers started questioning him.

The officers noted a fresh scratch on defendant's right cheek and a small scratch above his left eyebrow. Defendant also had fresh scratches on his right wrist, the top of his right hand, and on the back of his neck. During the booking process almost two hours later, one of the officers noted that the area above defendant's right eye was starting to bruise.

### D. Other Prosecution Evidence

Two days after the robbery, the police searched defendant's place of employment and found a plastic bag containing $67,700 in cash inside a file cabinet in a warehouse area. Defendant's employer testified that the money in the file cabinet did not belong to the company. Jasper's personal assistant testified that the notation "$8K" on a slip of paper on one of the bundles of money was written by her.

## II. Defense Case

### A. Defendant's Testimony

Defendant took the stand. Defendant claimed he was home in bed between 10:00 p.m. and 4:30 a.m. on the night of the robbery.

Defendant testified that he and Jasper were best friends in the early 1990's. After he was terminated from Jasper's company, he felt betrayed. He had quit a job at a decent company where he had

3

worked for seven years to go to work for Jasper. He admitted that he had difficulty with Jasper's son. He worked through his feelings of betrayal at AA.

When defendant asked Jasper for a loan in May 2002, Jasper reminded him that they had done a couple of drug deals in the past and suggested defendant put together a drug deal to earn some money. Defendant described two previous drug deals he and Jasper had participated in. Jasper wanted to be removed from the transactions, so he arranged for defendant to contact the supplier and obtain the drugs. Defendant brought the drugs to Jasper's house. Jasper weighed and tested the drugs and gave defendant cash to pay the supplier.

Defendant and Jasper did their first drug deal in the summer of 2000. It involved the purchase of five pounds of methamphetamine for $30,000. Defendant received $5,000 for his services. He did not know what Jasper did with the drugs after he bought them. They did the second deal in February or March of 2001. That time, Jasper bought 10 pounds of methamphetamine for $60,000 and paid defendant $10,000. They purchased the drugs from the same supplier both times. The supplier was someone defendant knew from AA.

In May 2002, after Jasper proposed they do a drug deal, defendant contacted the same supplier and put together a deal in which Jasper would buy 10 pounds of methamphetamine for $70,000. This time, defendant's share was to be $20,000. Defendant met the supplier on a Saturday in the parking lot behind a local restaurant. The supplier gave him 10 pounds of methamphetamine, which defendant placed in the trunk of his car. When he got home, defendant hid the drugs in his bedroom closet. He contacted Jasper and set up a meeting at Jasper's house for the following Tuesday. He brought Jasper the drugs. Jasper tasted the drugs and said they were good. Jasper had $68,000 laid out on his dining room table. He accused defendant of gouging him and refused to pay the $70,000 previously agreed upon. Defendant admitted he was gouging Jasper, since he was making more money off of this deal than he had on the previous deals. Defendant took $300 out of one of the bundles and placed the remaining money in a plastic bag. He then hid the bag at his place of employment. Defendant did not take the money directly to the supplier, because the supplier had returned to Las Vegas, where he lived at the time. Defendant planned to take the money to the supplier in Las Vegas by plane on May 31, 2002, the Friday after Memorial Day.

On cross-examination, the prosecutor asked defendant to provide the name, address, and telephone number of his narcotics supplier in Las Vegas. Defendant refused to provide the supplier's name, even after being ordered to do so by the judge. He claimed he did not know the address or telephone number. He had the supplier's telephone number written down somewhere, but refused to say where the number was, even after the court ordered him to provide

4

the information.

During the first drug deal, the supplier followed defendant to Jasper's house and thus knew where Jasper lived.  When asked why the supplier and Jasper needed him if the supplier knew where Jasper lived, defendant responded that Jasper wanted to be removed from the transaction.  Although Jasper wanted to be removed from the transaction, he allowed defendant to bring five- and ten-pound bundles of methamphetamine into his home.

### III. Motion to Strike Defendant's Testimony

Outside of the presence of the jury, the prosecutor made a motion to strike defendant's entire testimony because defendant had refused to provide the drug supplier's name and telephone number.  The prosecutor argued that defendant's refusal to answer the questions relating to his supplier made it impossible for the People to fully confront and cross-examine defendant.

At the hearing on the motion, defendant said he refused to give the supplier's name because he feared retaliation and feared for his life.  He claimed the supplier had hurt others in the past.  Defendant did not have any personal knowledge that the supplier had killed anyone.  He had not received any death threats and had not seen the supplier threaten anyone.

Defense counsel argued that the name and address of the supplier were collateral and did not relate to the issue of whether defendant was telling the truth.  The court concluded that the questions relating to the identity of the supplier were not collateral and advised defendant that if he did not answer, the court was prepared to strike his testimony.  Defense counsel also argued that defendant's refusal to answer one or two questions did not require the court to strike defendant's entire testimony and suggested other less drastic sanctions would be appropriate.  Defendant refused to provide the information again and the court struck his entire testimony.  When the jurors returned, the court advised the jury that it was striking defendant's testimony and not to consider it.

*People v. Hopple*, No. H025654, 2004 Cal. App. Unpub. LEXIS 2308, at *3-18 (Cal. Ct. App. Mar 12, 2004) (footnotes omitted).

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was

"adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) *overruled on other grounds*; *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord*

*Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). Where the state court gives no reasoned explanation of its decision on a Petitioner's federal claim and there is no reasoned lower court decision on the claim, a federal habeas court should conduct an independent review of the record. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id*.

In his petition for writ of habeas corpus, Petitioner asserts three claims for relief: (1) the trial court violated Petitioner's right to present a defense and right to due process by refusing to grant a two week continuance to allow the defense to investigate the newly disclosed criminal record of the main prosecution witness; (2) the prosecution violated Petitioner's right to due process under *Brady*

7

*v. Maryland*, 378 U.S. 83 (1963), by belatedly disclosing the witness's criminal record and withholding related police reports; and (3) the trial court violated Petitioner's right to trial, right to present a defense, and right to due process by striking his entire testimony after he refused to answer two questions on cross-examination.

## DISCUSSION

### 1.    Denial of Continuance

Shortly before the commencement of trial, the prosecution learned that Petitioner intended to accuse Jasper of dealing drugs as an element of his defense. *Hopple,* 2004 Cal. App. Unpub. LEXIS 2308, at *19.  Based on this information, the prosecutor reviewed Jasper's criminal record on the morning of November 25, 2002, the first day of trial.  *Id.*  From the criminal records, the prosecutor learned that Jasper was arrested in 1988 and charged with possession of cocaine and methamphetamine for sale.  *Id.*  In 1990, a jury convicted Jasper for possession of cocaine but acquitted Jasper on the possession of methamphetamine charge.  *Id.*  Petitioner argues that the trial court's refusal to grant a two week continuance to allow him to investigate Jasper's newly-disclosed criminal record violated his right to present a defense and right to due process under the Sixth and Fourteenth Amendments.

The prosecution provided this information to the defense the same day that they became aware of it.  *Id.* at *20.  Petitioner then made a motion in limine for a continuance, arguing that Jasper's past drug conviction would help substantiate and "dovetail with" Petitioner's defense that Jasper gave Petitioner the money found at Petitioner's place of employment to pay for drugs, and was not the fruits of robbing Jasper.  *Id.*  Petitioner requested a two week continuance to obtain Jasper's police records and develop further evidence and witnesses related to his

proposed defense.  *Id.*  The prosecution objected, arguing that the cocaine possession conviction was 12 years old and was not a crime of moral turpitude that could be used to impeach Mr. Jasper (a fact which Petitioner conceded).  *Id.*

In response to the trial court's questioning, defense counsel said that she learned of Petitioner's proposed defense "[q]uite sometime [sic] ago" and had not investigated the proposed defense prior to trial.  *Id.* at *21.  Defense counsel also said her predecessor failed to ask Jasper whether he had been convicted of a felony during the preliminary hearing.  *Id.*

Applying California Evidence Code section 353, the trial court concluded the potential evidence Petitioner sought in Mr. Jasper's criminal record was "too collateral and not really relative or probative" and denied Petitioner's motion for a continuance.  *Id.*  The trial court noted, however, that the Thanksgiving holiday would delay jury selection until December 2, 2002, giving the defense approximately one week to investigate Mr. Jasper's criminal record if they so desired.  *Id.* at *22.  The court also voiced a willingness to revisit the request for a continuance prior to jury selection and opening statements if the defense uncovered additional, probative evidence during that week.  *Id.*  The record indicates Petitioner failed to raise the continuance issue or introduce additional evidence concerning Jasper's criminal record during the remainder of the trial.  *Id.* at *23.

On appeal, the California Court of Appeal applied California law and concluded that the trial court did not abuse its discretion in denying Petitioner's request for a continuance.  *Id.* at *27.  The court reasoned as follows:

> Defendant had eight days between the hearing on his motion for a continuance and opening statements to conduct an investigation of the prior drug charges and provide the court with additional information supporting his request for a continuance. The issue was not raised again. Nothing in the record indicates whether defendant

9

conducted any further investigation into Jasper's prior arrest and conviction. Furthermore, defendant did not present the court with any evidence indicating what he uncovered in his investigation, whether the prior crime was similar to the drug deals he alleged to have participated in with Jasper, what additional investigation, if any, was needed to support his defense, what benefit he anticipated would result from additional investigation efforts, or the likelihood that such benefit would result. On this record, defendant has failed to persuade us that the trial court's ruling on the motion for the continuance was arbitrary or irrational or exceeded the bounds of reason.

*Id.* at *25-27.

### A.    Legal Standard

The Supreme Court of the United States has noted that there are no specific tests for deciding when a denial of a continuance is so arbitrary as to violate due process. *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). The Court has stated, however, that in deciding whether to grant a continuance, the trial judge must be afforded broad discretion, *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983); *Avery v. Alabama*, 308 U.S. 444, 446 (1940), and that the trial court's "answer must be found in the circumstances present in every case, particularly in the reasons present to the trial judge at the time the request is denied." *Sarafite*, 376 U.S. at 589.

For denial of a continuance to form the basis for habeas relief, there must be not only an abuse of discretion, but any resulting error must be "so arbitrary and fundamentally unfair that it violates constitutional principles of due process." *Bennett v. Scroggy*, 793 F.2d 772, 774-75 (6th Cir. 1986) (citation omitted). Moreover, the improper denial of a requested continuance warrants habeas relief only if there is a showing of actual prejudice to Petitioner's defense resulting from the trial court's refusal to grant a continuance. *See Gallego v. McDaniel*, 124 F.3d 1065, 1072 (9th Cir. 1997); *Martel v. County of Los Angeles*, 56 F.3d 993, 995 (9th Cir. 1995) (en banc).

10

**B.     Analysis**

The California Court of Appeal's rejection of Petitioner's claim was not contrary to or an unreasonable application of clearly established federal law. *See Williams*, 529 U.S. at 411. A review of the record shows that the trial court did not act arbitrarily or abuse its broad discretion in denying Petitioner's request for a continuance. First, the trial court noted that Petitioner was unlikely to discover material or probative evidence in Jasper's criminal record, given that Jasper's prior conviction for cocaine possession was then 12 years old and was not for a crime of moral turpitude that the defense could use to impeach him.

Furthermore, defense counsel had ample opportunity prior to trial to investigate Jasper's criminal record and failed to do so. Defense counsel was aware of Petitioner's proposed defense implicating Mr. Jasper as a drug dealer and neglected to investigate or develop this theory. Defense counsel also failed to question Jasper about any past felony convictions or his criminal record during the preliminary hearing. Equally importantly, jury selection was not scheduled to begin until eight days after the trial court denied Petitioner's request for a continuance. The trial court encouraged Petitioner to investigate Jasper's criminal record during this period. The trial court also voiced a willingness to revisit Petitioner's request for a continuance if further investigation turned up evidence that might be material to his defense.

The record contains no further information as to whether Petitioner undertook an investigation of Jasper's criminal record during this eight day window. Petitioner did not raise the request for a continuance again and neither the prosecution nor defense referred to Jasper's criminal record during the trial. Petitioner either failed to investigate Jasper's criminal record or, having obtained

the records, found them unhelpful.  In either event, on this record, it cannot be said that the trial court's denial of a continuance was "so arbitrary and fundamentally unfair" as to violate Petitioner's constitutional right to due process.  *Bennett*, 793 F.2d at 774-75.  Rather, the trial court's denial of the continuance was reasonable given the unlikelihood of Petitioner finding probative evidence in the records, the ample time available to Petitioner to investigate the records prior to trial, and the trial court's stated willingness to revisit the request if further investigation so warranted.

Even if the trial court's denial of the continuance amounted to constitutional error, Petitioner is not entitled to habeas relief because he has failed to establish that the trial court's ruling prejudiced his defense.  *See Brecht*, 507 U.S. at 623.  Petitioner did not attempt to introduce any additional evidence concerning Jasper's criminal record after the court reconvened on December 2, 2002, and Petitioner did not raise the request of a continuance again.  As such, there is nothing in the record to suggest the trial court's denial of a continuance prejudiced Petitioner's defense.  The state courts' rejection of the claim was not contrary to, or an unreasonable interpretation or, established Supreme Court precedent.  Petitioner is therefore not entitled to relief on this claim.

## 2.   *Brady* **Violation**

Petitioner contends that the prosecution's late disclosure of Jasper's criminal record and withholding of related police reports violated his Fourteenth Amendment right to due process under *Brady v. Maryland*, 373 U.S. 83.  Following the trial court's denial of Petitioner's request for a continuance, defense counsel acknowledged the trial court's advice that she use her investigator to obtain Mr. Jasper's criminal records.  *Hopple,* 2004 Cal. App. Unpub. LEXIS 2308, at *31.  On the theory that the prosecution might be able to

12

obtain the reports more quickly, defense counsel then asked the court to order the prosecution to turn over the police reports. *Id.* The prosecution objected to a formal court order but stated that he would "certainly make the request." *Id.* The trial court declined to issue an order, but noted that the prosecution now had "a duty under *Brady* to deliver [the records] to [the defense] and he can certainly facilitate it, but to couch it as an order in that regard, the court is going to decline to do that." *Id.* The trial judge also asked the prosecution to meet with the defense to facilitate disclosure of Jasper's police records. *Id.*

After this November 25 exchange in which the trial court reiterated the prosecution's obligations under *Brady*, the record contains no further information as to whether Petitioner obtained the reports or, if he did, what probative evidence may have been in them. *Id.* The defense raised no complaints that the prosecution was failing to comply with their requests for records. There are no defense allegations on the record that the prosecution suppressed potentially exculpatory information. There were no additional defense motions on this issue during the trial. Neither the prosecution nor the defense questioned Jasper about his criminal record or the 1988 arrest when Jasper testified during the trial. The police records at the center of this alleged *Brady* violation are not in the record on appeal and are not before this Court.

The California Court of Appeal applied *Brady* and rejected Petitioner's arguments on three separate grounds:

> First, there is no evidence that the prosecution or anyone on the prosecution team suppressed the police reports at issue. There is no evidence that the prosecution team had copies of the police reports when the request was made. In fact the record suggests that the prosecutor did not have the reports at that time. The only thing in the record is defense counsel's assumption that the prosecutor would be able to obtain copies of the police reports more quickly than she could. Second, the record does not indicate what information was contained in the police reports. Thus, we cannot determine whether the information in the police reports supported

13

> defendant's defense and was therefore exculpatory. Finally, on this record, defendant has not established a reasonable probability that the result of the proceedings would have been different had he received the reports, which in turn undermines our confidence in the verdict.

*Id.* at *32-33.

### A.    Legal Standard

Due process requires the prosecutor to disclose information that might create a reasonable doubt, that is, information that might lead to discovery of favorable evidence "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985): *see also United States v. Agurs*, 427 U.S. 97, 103-07 (1976) (holding constitutional standard of materiality imposes higher burden on defendant than ordinary harmless error standard).

In order to establish that the prosecutor's withholding of evidence constituted a due process violation, Petitioner must therefore prove three things: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A violation will be found under *Brady* by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *See Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

The prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. *See id.* at 437-38. "Because the

14

prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc). A prosecutor's duty under *Brady* necessarily requires the cooperation of other government agents who might possess *Brady* material. *United States v. Blanco*, 392 F.3d 382, 388 (9th Cir. 2004).

A defendant cannot claim a *Brady* violation if he was "aware of the essential facts enabling him to take advantage of any exculpatory evidence." *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (citing *United States v. Brown*, 582 F.2d 197, 200 (2d Cir.), *cert. denied*, 439 U.S. 915 (1978)); *see, e.g., United States v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (where government discloses all information necessary for defense to discover alleged *Brady* material on its own, government is not guilty of suppressing evidence); *Wallace v. Hocker,* 441 F.2d 219, 220 (9th Cir. 1971) (the failure of the state sua sponte to produce evidence of which the defendant was aware provides no foundation for a suppression claim).

## B.    Analysis

The California Court of Appeal correctly applied *Brady* and Petitioner's claim that the prosecution violated his right to due process by late disclosure of Jasper's criminal record and withholding of related police reports is without merit. The trial court never rendered a decision on whether Jasper's criminal records were admissible evidence. The defense conceded that Petitioner could not use Jasper's previous conviction for cocaine possession to impeach him, and the defense made no attempts to introduce other evidence obtained from Jasper's criminal record. Neither the prosecution nor defense referred to Jasper's criminal conviction, or the content of his criminal record, during the trial. The contents of

Jasper's police reports is not before this Court.  The sole reference to any type of drug deal during Jasper's testimony occurred during defense counsel's cross-examination:

> Q: Did you tell the police that three days prior to this incident someone gave you $80,000? Someone paid you $80,000 and you put $70,000 in the drawer and the remainder on the entertainment center?
> A: No, I don't believe I said that, no.
> Q: It is true that in a drug case someone paid you $80,000?
> A: That's absolutely not true.

Rep. Tr. at 178.

Even had the trial court ruled that Jasper's criminal record was inadmissible, however, that would not necessarily preclude Petitioner's *Brady* claim.  The circuits are presently mixed on whether inadmissible evidence can form the basis of a *Brady* claim. *See Paradis v. Arave*, 240 F.3d 1169, 1178 (9th Cir. 2001). Some circuits have held that if evidence is itself inadmissible, it cannot be material under *Brady*.  *Id.* (citations omitted).  Others circuits allow that inadmissible evidence can be material under *Brady*.  *Id.* (citations omitted).

The Supreme Court has provided little guidance.  *See Wood v. Bartholomew*, 516 U.S. 1 (1995).  The *Bartholomew* Court reversed the Ninth Circuit's grant of a habeas writ because it was not "reasonably likely" the disclosure of inadmissible polygraph results would have changed the outcome of the trial.  *Id.* at 8.  While the Court disapproved of the Court of Appeals' "mere speculation" that disclosure of the polygraph results might have led to the discovery of admissible evidence, the Court did not categorically reject the possibility of basing a *Brady* claim on inadmissible evidence that could have led to the discovery of admissible evidence.  *Id.* at 6.

It is clear under Ninth Circuit precedent that evidence is material if it might have been used to impeach a government witness and that evidence can be used to

16

"impeach a witness" even if the evidence is not itself admissible, even to impeach. *Paradis,* at 1179.  Under *Paradis*, information obtained from Jasper's criminal records could potentially satisfy the *Brady* standard of materiality.

Assuming Jasper's criminal records were material, Petitioner has not established that the prosecution did not meet its *Brady* obligation in failing to disclose Jasper's police reports to the defense.  On the morning of the first day of trial, the prosecution reviewed Mr. Jasper's criminal record.  Petitioner has not established that the prosecutor neglected his obligation either to cooperate with other government agents in obtaining Jasper's records, or to discover other potential *Brady* material stemming from Jasper's records that he "did not know but could have learned."  *Carriger,* 132 F.3d at 480.  Rather, the record indicates the prosecution reviewed Jasper's criminal record shortly after learning that Petitioner intended to implicate Jasper in a drug deal as an element of his defense. Furthermore, the prosecutor disclosed the contents of Jasper's criminal record to the defense the same day he reviewed it.  Petitioner has not established that there was material beyond that which the prosecutor disclosed that it had a duty to provide to him.

Moreover, to the extent that Petitioner claims that the *Brady* violation stems from Jasper's criminal record, the prosecution's disclosure gave Petitioner the necessary information to find or develop any potential *Brady* material from Jasper's record.  *See Bracy*, 67 F.3d at 1428-29.  After the trial court encouraged defense counsel to use her investigator to research Jasper's record, counsel indicated her intent to do so.  Rep. Tr. at 14.  The record is silent on whether defense counsel followed through.  The defense never requested more time to obtain the records.   The defense raised no complaints that the prosecutor had reneged on his commitment to request the criminal records, or was stonewalling

1    Petitioner's investigator, or was neglecting to disclose more potential *Brady*

2    material in other government files – all of which might give rise to a colorable

3    *Brady* claim.  On this record before us, however, we find the state court's findings

4    that the prosecutor's initial disclosure of Jasper's criminal record is not contrary

5    to, or an unreasonable interpretation of, established Supreme Court precedent.

6         Petitioner further argues that the prosecution withheld, and thus

7    suppressed, Jasper's criminal records in violation of *Brady*, see *Strickler,* 527

8    U.S. at 281-82.  However, the record is bereft of any support for Petitioner's

9    allegation of suppression.  First, as described above, the record suggests the

10    prosecution reviewed Jasper's criminal record on  the first day of trial and then

11    communicated the contents of that record to defense counsel later the same day.

12    This undercuts any suggestion of attempted suppression of the records.

13         After the trial court rejected Petitioner's request that the court order the

14    prosecution to turn over the records, the prosecution volunteered to request the

15    reports.  The court also reiterated the prosecution's obligation under *Brady* to

16    disclose potentially exculpatory evidence and asked the prosecutor to meet with

17    defense counsel to facilitate disclosure of the reports.  As the Court of Appeal

18    noted, there is no further mention of the reports in the record, and certainly no

19    allegations of suppression, raising the inference that Petitioner either declined to

20    request the police reports or, having obtained them, found them of no use to his

21    defense.  In either event, Petitioner has failed to establish that the prosecution

22    suppressed exculpatory records in violation of *Brady*.

23         Contrary to Petitioner's claim, furthermore, the prosecution's disclosure of

24    Jasper's criminal record was timely within the meaning of *Brady*, even though it

25    was the first day of trial, because there was still "sufficient time" for Petitioner to

26    examine and leverage Jasper's criminal record.  *See LaMere v. Risley*, 827 F.2d

27

28                                       18

622, 625 (9th Cir. 1987) (holding that due process requires the disclosure of exculpatory material in sufficient time to permit defendant to make effective use of the material).  As the trial court noted, Petitioner had eight days between the prosecution's disclosure of Mr. Jasper's criminal record and the start of jury selection.  Given the prosecutor's offer to request the records and the trial court's willingness to revisit Petitioner's request for a continuance if Petitioner needed more time to obtain the records, or to develop more evidence or witnesses based on the records, we cannot say that eight day window was so short as to offend Petitioner's due process rights.

Finally, Petitioner cannot establish prejudice to his defense under the standard of review applicable to *Brady* claims.  *See Kyles,* 514 U.S. at 435 (the question is whether in the absence of the material, defendant received a fair trial); *United States v. Zuno-Arce*, 339 F.3d 886, 890-91 (9th Cir. 2003) (*Brady/Bagley* claim rejected because, even assuming that evidence was both favorable and undisclosed, petitioner could not show prejudice because there was no reasonable probability that, had it been disclosed, the evidence would have made a difference to the outcome of the trial).  The mere fact of Jasper's 12-year-old conviction for drug possession could not reasonably put the instant case in "such a different light" so as to undermine confidence in the verdict.  *Kyles,* 514 U.S. at 435.  First, the trial court found that the cocaine possession conviction could not be used to impeach Jasper.  Compelling direct and circumstantial evidence, furthermore, connected Petitioner to the crime, including his tumultuous relationship with Jasper, distinctive odor, familiarity with Jasper's oxygen machine, recent cuts and scratches, possession of money identified as belonging to Jasper and freshly showered appearance when the police arrived to question him at 4:25 am.

Finally, Petitioner's defense that he and Jasper engaged in a cooperative

drug deal was not convincing.  As the Court of Appeal noted, Petitioner's claim that the alleged drug supplier extended him over $70,000 in credit is implausible. Similarly, Petitioner testified that he intended to fly to Las Vegas on the Friday before Memorial Day to pay his drug supplier, but he delivered the drugs to Jasper five days beforehand, on a Sunday, and chose to store the money in an unlocked, shared drawer at his workplace, inconsistent with a planned drug transaction.  Further, Petitioner's testimony did not explain the cuts and scratches on his face, neck and hands shortly after and consistent with the struggle that took place during the robbery or why Jasper's back door had been forced.  Given the weight of evidence against Petitioner and the weakness in his alibi, Petitioner has failed to establish with any reasonable probability that the results of the trial would have been different had he received Jasper's criminal records. Thus, this Court finds that the state courts' decision is not contrary to federal law and that Petitioner is not entitled to relief on his *Brady* claim.

**3.    Striking of Petitioner's Testimony**

Petitioner argues that the trial court violated his constitutional rights to trial, to present a defense, and to due process by striking his entire testimony after he refused to answer two prosecution questions on cross-examination.  During the trial, Petitioner took the stand in his own defense and denied robbing Jasper. *Hopple,* 2004 Cal. App. Unpub. LEXIS 2308, at *12.  Petitioner testified that he renewed his relationship with Jasper in 2002, after a period when the men were not in touch.  *Id.* at *13.  Petitioner, who had encountered financial difficulties and was having difficult paying debts, requested money from Jasper.  *Id.* According to Petitioner's testimony, Jasper suggested instead that they complete a drug deal, as he said they had done twice before in the past.  *Id.*

Petitioner testified that he obtained 10 pounds of methamphetamine from a

20

supplier he had used before at a price of $70,000, to be paid later.  *Id.* at *14.

Petitioner then brought the drugs to Jasper's home several days later, where

Jasper tasted the drugs and gave Petitioner approximately $67,000 to pay the

supplier.  *Id.*  Petitioner put the money in a white plastic bag, took it to his place

of employment, and put the money in an unlocked file drawer.  *Id.* at *15.  The

police found and seized this money while investigating Petitioner's involvement

in the burglary and robbery of Jasper.  *Id.* at *9.

On cross-examination, Petitioner testified that he did not pay the drug

supplier immediately after Jasper gave him the $67,000 because he intended to fly

to Las Vegas several days later and pay the supplier there.  *Id.* at *15.  The

prosecution then asked Petitioner for the alleged drug supplier's name.  *Id.* at *16.

Petitioner refused to answer.  *Id.*  Petitioner also refused to answer the

prosecution's subsequent request for the drug supplier's address and phone

number, even after the trial court ordered Petitioner to respond.  *Id.*

Without the jury present, the prosecutor argued that he had a right to cross-

examine Petitioner on material elements of his testimony.  *Id.* at *17.  The

prosecution requested that the trial court strike Petitioner's testimony altogether if

Petitioner continued to refuse to answer the questions about his drug supplier.  *Id.*

Petitioner responded that he feared for his life if he revealed the name of his

supplier or other details about him.  *Id.*  Petitioner acknowledged the supplier had

not threatened him directly, but said his fears were based on information he heard

from other acquaintances who had dealt with the supplier before.  *Id.*  Defense

counsel further argued that the court should consider a less severe sanction that

striking Petitioner's entire testimony given the importance of Petitioner's right to

present a defense.  *Id.* at *18.

In response to the prosecutor's request, the trial court decided to strike

21

Petitioner's entire testimony and reconvened the jury. *Id.* At this point, the trial court instructed the jury not to consider Petitioner's testimony as evidence and to continue as if they had never heard him testify. *Id.*

Turning to California law and in particular *People v. Reynolds*, 152 Cal. App. 3d 42 (1984), the Court of Appeal concluded that the trial court did not abuse its discretion in striking Petitioner's entire testimony. *Id.* at *39. The court noted that the questions Petitioner refused to answer "went to the heart of defendant's claim that Jasper gave him the money to pay off a drug supplier." *Id.* Petitioner's refusal to answer "deprived the prosecution of its right on cross-examination to test defendant's credibility, knowledge, recollection, and the weight of his testimony." *Id.* Finding other elements of Petitioner's defense improbable, and "given the significance and the relevancy of the questions defendant refused to answer," the appellate court concluded that it could not say the trial court abused its discretion by striking defendant's entire testimony. *Id.* at *40.

### A.    Legal Standard

The Supreme Court has held that "cross-examination of a witness is a matter of right." *Alford v. United States*, 282 U.S. 687, 691 (1931). The reason for this important trial right, the Court continued, was that "prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test." *Id.* at 692. The Court's cases "make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton v. Evans*, 400 U.S. 74, 89 (1970) (citing *California v. Green*, 399 U.S. 149, 161 (1970)).

22

A defendant who testifies in his own behalf waives his privilege against self-incrimination with respect to the relevant matters covered by his direct testimony and subjects himself to cross-examination by the government. *See Brown v. United States*, 356 U.S. 148, 154-55 (1958); *United States v. Hearst*, 563 F.2d 1331, 1338 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000 (1978). If a defendant testifies but then refuses to be cross-examined, his testimony accordingly may be stricken. *See Williams v. Borg*, 139 F.3d 737, 740-43 (9th Cir. 1998) (defendant refused to be cross-examined on his prior convictions). "The right to testify carries with it the obligation to submit to cross-examination." *Id.* at 743 (citation omitted). That a defendant faces such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against self-compelled incrimination. *See Williams v. Florida*, 399 U.S. 78, 83-84 (1970).

In *Denham v. Deeds*, the Ninth Circuit held that "where a defense witness refuses to answer questions that go to the heart of the direct testimony on a central issue...the truth-seeking function of the court is impaired." 954 F.2d 1501, 1504 (9th Cir. 1992). The *Denham* court concluded that "where a defense witness's invocation of Fifth Amendment protection against self-incrimination amounts to a refusal to be cross-examined, the testimony cannot be considered reliable," and ruled that the witness's testimony was properly excluded by the trial court. *Id.* In *United States v. Cardillo,* the Second Circuit held that "if the witness by invoking the privilege precludes inquiry into the details of his direct testimony, there may be a substantial danger of prejudice because the defense is deprived of the right to test the truth of his direct testimony and, therefore, that witness's testimony should be stricken in whole or in part." 316 F.2d 606, 611 (2d Cir. 1963).

23

### B.    Analysis

Petitioner's argument that the trial court violated his constitutional rights by striking his entire testimony is without merit.  Petitioner voluntarily took the stand in his own defense and, having invoked his right to testify, must honor his obligation to undergo cross-examination.  *See Borg*, 139 F.3d at 743.  As the Supreme Court has noted, the government enjoys an absolute right to cross-examine Petitioner and his refusal to answer material questions about his direct testimony hindered the government's ability to "place the witness in his proper setting and put the weight of his testimony and his credibility to a test."  *Alford*, 282 U.S. at 692.

As the Court of Appeal noted, Petitioner's contention that the questions he refused to answer on cross-examination were collateral and immaterial to his testimony is incorrect.  Petitioner's defense was premised on his assertion that Jasper voluntarily gave him $67,000 to pay a drug supplier with whom Petitioner had previously dealt.  Petitioner testified that he took this money to store at his place of employment pending a trip to Las Vegas almost a week later to meet and pay the supplier.  As such, the drug supplier's identity was not a collateral matter in Petitioner's testimony, but rather a fundamental element of Petitioner's defense, as it explained Petitioner's possession of the $67,000 identified as belonging to Jasper.

Given the centrality of the alleged drug supplier to Petitioner's defense, the name and other identifying details of the drug supplier "go to the heart" of Petitioner's direct testimony.  *Denham*, 954 F.2d at 1504.  Petitioner's refusal on cross-examination to provide these details about the drug supplier precluded the prosecution from probing the veracity and credibility of his testimony and rendered that testimony unreliable.  Neither the prosecution nor the jury were

provided an opportunity to assess Petitioner's knowledge of, familiarity with, or recall of the drug supplier, thereby preventing them from adequately assessing his defense. Petitioner's stance impaired "the truth-seeking function of the court" and as such, it was well within the trial court's discretion to strike his testimony. *Id.*

Petitioner's contends that he feared endangering himself by revealing identifying details about the drug supplier. Petitioner conceded, however, that the alleged drug supplier had not threatened him personally, and his testimony about the supplier's other rumored acts of retribution was unsubstantiated. On this basis, the trial court determined that assessing and probing Petitioner's familiarity with the alleged drug supplier outweighed his claimed fear of retribution and ordered Petitioner to answer the prosecution's questions or risk sanction.

At trial, defense counsel argued that Petitioner's refusal to answer two discrete questions called for a less severe sanction than striking his entire testimony. It was well within the trial court's discretion, of course, to strike only part of Petitioner's testimony, or to adopt other sanctions. Indeed, California courts have noted that when a witness refuses to answer questions, partial striking of testimony may often be preferable to striking the witness' entire testimony. *See People v. Hecker*, 219 Cal. App. 3d 1238 (1990); *People v. Reynolds*, 152 Cal. App. 3d 42 (1984). In the instant case, however, the drug supplier was a fundamental element of Petitioner's testimony and the identify of the supplier went to the heart of Petitioner's defense. In this context, the state court's determination that striking Petitioner's testimony was not improper is not contrary to, or an unreasonable interpretation of, established federal law. Thus, Petitioner is not entitled to relief on this claim.

25

1

## CONCLUSION

2          After a careful review of the record and pertinent law, the petition for writ

3  of habeas corpus is DENIED.  The Clerk shall enter judgment in favor of

4  Respondent and close the file.

5          IT IS SO ORDERED.

6          Dated:06/26/07

7                                                  _____
                                                   JEFFREY S. WHITE
8                                                  United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26